

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: February 27, 2018**

The Order of the Court is set forth below. The docket reflects the date entered.

---

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| **COMMUNITY HOME FINANCIAL SERVICES, INC.,** | **CASE NO. 12-01703-NPO** |
| **DEBTOR.** | **CHAPTER 11** |
| **KRISTINA M. JOHNSON, TRUSTEE OF THE ESTATE OF COMMUNITY HOME FINANCIAL SERVICES, INC.** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 14-00030-NPO** |
| **COMMUNITY HOME FINANCIAL SERVICES, INC., DISCOUNT MORTGAGE, INC., DISCOUNT HOME MORTGAGE, INC., DOUBLE S CONSTRUCTION, INC., CRISCO INVESTMENTS, INC., VICTORY CONSULTING GROUP, INC., WILLIAM D. ENTERPRISES, INC., WILLIAM D. DICKSON, W. W. WARREN FOUNDATION, PHALANX, INC., BROOKWOOD-BYRAM COUNTRY CLUB, INC., AND RESHONDA RHODES** | **DEFENDANTS** |

## MEMORANDUM OPINION
## AND ORDER ON FIRST AMENDED
## VERIFIED COMPLAINT TO: (1) RECOVER MONEY,
## DAMAGES OR PROPERTY; (2) TO AVOID PRE-PETITION AND
## POST-PETITION TRANSFERS; (3) FOR TURNOVER OF PROPERTY;
## (4) FOR INJUNCTIVE RELIEF; AND (5) FOR EQUITABLE SUBORDINATION

This matter came before the Court[1] for trial on December 7, 2017 (the "Trial"), on the First Amended Verified Complaint To: (1) Recover Money, Damages or Property; (2) To Avoid Pre-Petition and Post-Petition Transfers; (3) For Turnover of Property; (4) For Injunctive Relief; and (5) For Equitable Subordination (the "Amended Complaint") (D. Adv. Dkt. 33)[2] filed by Kristina M. Johnson, trustee of the estate of Community Home Financial Services, Inc. (the "Trustee"); the Defendant Reshonda Rhodes' Answer to First Amended Verified Complaint To: (1) Recover Money, Damages or Property; (2) To Avoid Pre-Petition and Post Petition Transfers; (3) For Turnover of Property; (4) For Injunctive Relief; and (5) For Equitable Subordination ("Rhodes Answer") (D. Adv. Dkt. 60) filed by Reshonda Rhodes ("Rhodes"); and the Answer and Defenses of Defendants, Discount Mortgage, Inc., Discount Home Mortgage, Inc.[,] Double S Construction, Inc., Crisco Investments, Inc., Victory Consulting Group, Inc., William D. Dickson Enterprises, Inc., William D. Dickson, W.W. Warren Foundation, Phalanx, Inc., Community Home Financial Services, Inc. and Brookwood-Byram Country Club, Inc. to First Amended Verified Complaint

---

[1] On May 23, 2012, the Bankruptcy Case was assigned originally to Bankruptcy Judge Edward Ellington.  On February 1, 2017, the Bankruptcy Case and all related adversary proceedings were transferred to the above-signed Bankruptcy Judge.  (Bankr. Dkt. 1609).

[2] Citations to the record are as follows: (1) citations to docket entries in the above-styled adversary proceeding (the "Dickson Adversary Proceeding") are cited as "(D. Adv. Dkt. __)"; (2) citations to docket entries in the above-styled bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. __)"; and (3) citations to the Memorandum Opinion and Order on Third Amended Complaint in Adversary Proceeding 12-00091-NPO; Consolidated Amended Complaint in Adversary Proceeding 13-00104-NPO; Amended Complaint for Turnover, Recovery or Property Transferred Post-Petition, Damages, Declaratory Relief, Equitable Subordination, and Other Relief in Adversary Proceeding 15-00080-NPO; and Consolidated Contested Matters (the "Global Opinion") (Bankr. Dkt. 2182) are cited as "(Global Op. at __)".  *See also* Final Judgment on Third Amended Complaint in Adversary Proceeding 12-00091-NPO; Consolidated Amended Complaint in Adversary Proceeding 13-00104-NPO; Amended Complaint for Turnover, Recovery or Property Transferred Post-Petition, Damages, Declaratory Relief, Equitable Subordination, and Other Relief in Adversary Proceeding 15-00080-NPO; and Consolidated Contested Matters (Bankr. Dkt. 2183).

("Dickson and Corporate Defendants Answer") (D. Adv. Dkt. 75) filed by Discount Mortgage, Inc. ("DMI"), Discount Home Mortgage, Inc. ("DHMI"), Double S Construction, Inc. ("Double S"), Crisco Investments, Inc. ("Crisco"), Victory Consulting Group, Inc. ("Victory Consulting"), William D. Dickson Enterprises, Inc. ("Dickson Enterprises"), W.W. Warren Foundation ("Warren Foundation"), Phalanx, Inc. ("Phalanx"), Community Home Financial Services, Inc. ("CHFS"), and the Brookwood-Byram Country Club, Inc. ("BBCC") (collectively, the "Corporate Defendants") and William D. "Butch" Dickson ("Dickson") in the Dickson Adversary Proceeding.[3]  Together, Dickson and Rhodes are referred to as the "Individual Defendants."  The Pretrial Order[4] (the "PTO") (D. Adv. Dkt. 284) was entered on December 5, 2017.  At Trial,[5]

---

[3] In the Amended Complaint, the Trustee also named as defendants Colby Dickson, Cristen Dickson Nelson, Beau Nelson, Carol Runnels ("Runnels"), Nick Clark d/b/a Nick Clark Auctions ("Clark"), and William Head d/b/a Head Auctions ("Head").  The defendants Clark and Head were dismissed on March 13, 2017, pursuant to the Order Dismissing Defendants Nick Clark d/b/a Nick Clark Auctions and William Head d/b/a Head Auctions (D. Adv. Dkt. 177).  Runnels was dismissed on May 24, 2017, pursuant to the Order Granting Dismissal of Defendant Carol Runnels *[Dkt. # 211]* (D. Adv. Dkt. 213).  The Trustee resolved all claims against Dickson's children, Colby Dickson and Cristen Dickson Nelson, and Dickson's son-in-law, Beau Nelson, pursuant to the Order Granting Motion for Authority, Pursuant to Bankruptcy Rule 9019, To Enter into Settlement Agreement with Certain Defendants in Adversary Proceeding 14-00030-NPO and Execute Certain Documents Regarding the Same *[Dkt. #268]* (D. Adv. Dkt. 280), entered on December 1, 2017.

[4] Rule 16 of the Federal Rules of Civil Procedure applies in adversary proceedings pursuant to Rule 7016 of the Federal Rules of Bankruptcy Procedure.  Rule 16(d) provides that the pretrial order "controls the course of the action unless the court modifies it."  FED. R. CIV. P. 16(d).  "It is a well-settled rule that a joint pretrial order signed by both parties supercedes all pleadings and governs the issues and evidence to be presented at trial."  *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 350 n.5 (5th Cir. 2002) (quoting *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000)).  While Rhodes contributed to the PTO, neither Dickson nor the Corporate Defendants contributed to the PTO, despite receiving a draft from the Trustee's counsel with instructions on how to contribute to the PTO.  Rhodes did not object to the final form of the PTO.  (PTO at 1, n.1 & 53).

[5] A transcript of the Trial is docketed in the Dickson Adversary Proceeding at D. Adv. Dkt. 296.

Jeffrey R. Barber and Stephanie B. McLarty represented the Trustee, and Rhodes appeared without the assistance of counsel. Neither Dickson nor an attorney acting on behalf of Dickson or any of the Corporate Defendants appeared at Trial.

During the Trial, the Trustee introduced into evidence forty-six (46) stipulated exhibits and six (6) additional exhibits.[6] The issues in the Dickson Adversary Proceeding that remained for Trial are: (1) whether the Individual Defendants violated the Federal Racketeer Influenced and Corrupt Organizations Act; (2) whether the Individual Defendants violated the Mississippi Racketeering Act; (3) whether the Individual Defendants and the Corporate Defendants tortiously interfered with a contract; (4) whether the Trustee may avoid the Individual Defendants' and the Corporate Defendants' pre-petition transfers under Mississippi law; (5) whether the Trustee may avoid the Individual Defendants' and the Corporate Defendants' pre-petition transfers under 11 U.S.C. § 548(a)(1)(A)[7]; (6) whether the Trustee may avoid the Individual Defendants' and the Corporate Defendants' post-petition transfers under § 549; (7) whether the Trustee is entitled to a judgment directing the Individual Defendants and the Corporate Defendants to turn over the property of CHFS; (8) whether the Individual Defendants and the Corporate Defendants violated the automatic stay; (9) whether the Individual Defendants and the Corporate Defendants converted property of CHFS's estate (the "Estate"); (10) whether Dickson's Proof of Claim 10-1 should be equitably subordinated below all other unsecured creditors; and (11) whether the Individual Defendants and the Corporate Defendants conspired to defraud the Estate and its creditors. (PTO

---

[6] The exhibits introduced into evidence at Trial by the Trustee are cited as "(D. Ex. P-#)". Certain exhibits introduced into evidence contain personal identifies and, therefore, were redacted to comply with Rule 9037 of the Federal Rules of Bankruptcy Procedure.

[7] Hereinafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code, unless otherwise noted.

at 31-33).  The Court, having considered the pleadings, evidence, and arguments of counsel, finds as follows:[8]

## Jurisdiction

This Court has jurisdiction over the subject matter of and the parties to this Dickson Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(A), (B), E), (F), and (O).  Notice of the Trial was proper under the circumstances.

## Parties

### A.    Corporate Defendants

1.      CHFS, a Delaware company, is a mortgage servicing entity that for the most part purchased mortgage loan portfolios at a discount from various third parties and serviced those loans, as well as loans owned by DMI and DHMI (Bankr. Dkt. 167).   Until early 2014, Dickson was CHFS's chief executive officer.  Through at least January of 2014, CHFS's principal place of business was located at 234 East Capitol Street, in Jackson, Mississippi (the "Jackson Office"), where employees, including Dickson's family members, serviced mortgage loan portfolios, each one consisting of hundreds of individual notes secured by mostly subordinate residential mortgages on property located in over thirty (30) states in the United States.  (D. Adv. Dkt. 273 at 3).  Dickson Enterprises owned the building that housed the Jackson Office and leased the space to CHFS.  Dickson lived in an apartment on the third floor of the same building.  (D. Adv. Dkt. 296 at 48).

---

[8] These findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such.  Moreover, to the extent any conclusion of law is construed as a finding of fact, it is adopted as such.

2.      The Corporate Defendants are insiders and/or affiliates of CHFS as defined in § 101 (31).

3.      Victory Consulting, a Delaware corporation, wholly owns DMI and DHMI and is the majority shareholder of CHFS (D. Adv. Dkt. 273 at 1-2 & 277-1 at 43).

4.      DMI is a Mississippi corporation.

5.      DHMI is a Mississippi corporation.

6.      Double S is a Mississippi corporation.

7.      Crisco is a Mississippi corporation.

8.      Dickson Enterprises is a Delaware corporation registered to do business in Mississippi.

9.      Phalanx is a corporation organized and existing under the laws of Costa Rica and is listed on the real property tax rolls of Hinds County, Mississippi with the Jackson Office address (D. Adv. Dkt. 277-1 at 32-33).

10.     BBCC is a Mississippi corporation.

11.     The Warren Foundation is a Panamanian foundation named by Dickson. Dickson's adult children, Colby Dickson and Cristen Dickson Nelson, are the primary beneficiaries. (D. Adv. Dkt. 277-1 at 28-29; D. Ex. P-33).

12.     DMI, DHMI, Victory Consulting, Crisco, Double S, and Dickson Enterprises shared space in the Jackson Office with CHFS. (D. Adv. Dkt. 273 at 3). Additionally, CHFS, DMI, DHMI, Victory Consulting, Crisco, Double S, and Dickson Enterprises shared some employees. (PTO at 29). Only three of the Corporate Defendants were not located at the Jackson Office, including the Warren Foundation, Phalanx, and BBCC.

**B.      Individual Defendants**

13.      Dickson was at all relevant times an officer, director, and/or person in control of the Corporate Defendants.  (D. Adv. Dkt. 273 at 2).  Dickson was sentenced to serve fifty-seven (57)-months in a federal correctional facility for bankruptcy fraud.  (D. Ex. P-3).  He is currently serving the remainder of his sentence at a halfway house in Maryland.

14.      Rhodes is a former employee of CHFS and DMI.  (PTO at 29; D. Adv. Dkt. 296 at 111-15 & 273 at 3).

<b>Summary of Facts[9]</b>

1.      CHFS was not primarily in the business of loaning money to third parties.  In early 2012, however, CHFS transferred $3.7 million, in multiple transactions, to Dickson and some of the Corporate Defendants.  (Bankr. Dkt. 115 at 6; D. Ex. P-36 at 10, Schedule 8).  This sum includes the following purported loans:

      a.      On February 14, 2012, CHFS advanced $250,000 to Dickson ("Dickson Note") (D. Ex. P-8), $500,000 to Double S ("Double S Note 1") (D. Ex. P-9), and $500,000 to DMI ("DMI Note 1") (D. Ex. P-10) on an unsecured basis pursuant to promissory notes (PTO at 29).

      b.      On February 15, 2012, CHFS loaned $350,000 to Dickson Enterprises ("Dickson Enterprises Note") (D. Ex. P-11) on an unsecured basis pursuant to a promissory note (PTO at 30).

---

[9] For additional facts and a more complete understanding of the context of the matters discussed below, see the Global Op. at 20-94.  This discussion includes only a general summary of the Global Opinion, and any inconsistency between the Global Opinion and this Opinion should be resolved in favor of the Global Opinion.

c.    On March 14, 2012, CHFS loaned $400,000 to Double S ("Double S Note 2") (D. Ex. P-12) on an unsecured basis pursuant to a promissory note (PTO at 30).

e.    On April 12, 2012, CHFS loaned $500,000 to Crisco ("Crisco Note 1") (D. Ex. P-13) on an unsecured basis pursuant to a promissory note (PTO at 30).

f.    On May 14, 2012, CHFS loaned $450,000 to Crisco ("Crisco Note 2") (D. Ex. P-14) and $250,000 to DMI ("DMI Note 2") (D. Ex. P-15) on an unsecured basis pursuant to promissory notes (PTO at 30).

2.    On May 23, 2012, CHFS filed a petition for relief under chapter 11 of the U.S. Bankruptcy Code (Bankr. Dkt. 1).

3.    On October 29, 2013, Dickson changed the ACH deposit arrangement with Advantage ACH from CHFS's account at BancorpSouth Bank ("BancorpSouth") to a Victory Consulting account at Wells Fargo Bank ("Wells Fargo") (PTO at 30; D. Ex. P-20; D. Adv. Dkt. 273 at 6).

4.    On December 20, 2013, CHFS's bankruptcy attorney, Derek A. Henderson ("Henderson"), filed the Disclosure of Transfer of Funds and Other Matters (the "Disclosure") (Bankr. Dkt. 426; D. Ex. P-19), notifying the Court of the following:

1)    CHFS has changed its principal place of business from Jackson, Mississippi to Panama.

2)    CHFS has transferred funds from the DIP [Operating Account] at Wells Fargo Bank to other CHFS bank accounts located in Panama.

3)    CHFS has set up two (2) branch offices-one in Panama and one in Costa Rica.  The business operations of CHFS are continuing to be conducted at these two branch locations.

(*Id.*).  Contrary to the Disclosure, the funds were not transferred "to other CHFS bank accounts" but to accounts held by some of the Corporate Defendants.

5. In December of 2013, CHFS, or those acting on its behalf, filed notices in at least five chapter 13 bankruptcy cases pending in other jurisdictions requesting that payments owed to CHFS be sent to "Community Home Financial Services, Inc., P.O. Box 27740, Las Vegas, NV 89126-7740." (PTO at 30; D. Ex. P-30 at 3).

6. Borrowers of CHFS also were sent letters directing payments to "Community Home Financial Services, Inc., Global World Link, 8610 NW 72nd Street, PTY, Miami, FL 33166" (the "Las Vegas P.O. Box") (PTO at 30; D. Ex. P-23 at 3, 10, 12 & 14).

7. On February 11, 2014, Dickson sent an e-mail to CHFS's registered agent for service of process in Las Vegas, Nevada, directing the registered agent to use DMI's UPS account number to ship CHFS's mail to "William D. Dickson c/o Xinia Avila Esquivel, Oficentro La Sabana Edif., 7 Planta Baja, San Jose, Costa Rica." (PTO at 31; D. Ex. P-25).

8. Banco Panameño de la Vivienda, S.A. ("Banco Panameño")[10] returned a check to BancorpSouth made payable to CHFS from an account at BancorpSouth in Tupelo, Mississippi, pursuant to an International Collection Letter dated March 6, 2014 (PTO at 31; D. Exs. P-26 & 27).

9. On February 3, 2014, the Trustee sent a letter to DMI, DHMI, Victory Consulting, Dickson Enterprises, Double S, and Dickson demanding the return of CHFS's property (PTO at 31).

10. The Trustee demanded turnover from BBCC in a letter dated February 4, 2014 (PTO at 31).

11. On June 4, 2014, the Trustee initiated the Dickson Adversary Proceeding by filing the Verified Complaint To: (1) Recover Money, Damages or Property; (2) To Avoid Pre-Petition

---

[10] Banco Panameño later became known as Banvivienda.

and Post-Petition Transfers; (3) For Turnover of Property; (4) For Injunctive Relief; and (5) For Equitable Subordination (D. Adv. Dkt. 1).  On June 25, 2014, the Trustee filed the Amended Complaint, alleging seventeen (17) Counts for affirmative relief.

12.     On August 8, 2014, Rhodes filed the Rhodes Answer.

13.     On September 8, 2014, Dickson and the Corporate Defendants filed the Dickson and Corporate Defendants Answer.

14.     At Trial, counsel for the Trustee announced that the Trustee had abandoned Counts 5, 6, 8, 10, 14, and 17 of the Amended Complaint.  (D. Adv. Dkt. 296 at 16).  Additionally, counsel for the Trustee stated that the Trustee no longer challenged the transfer of Victory Consulting's stock to the Warren Foundation.  (D. Adv. Dkt. 296 at 39-40).

**Absence of Representation of Dickson and the Corporate Defendants at Trial**

The Court pauses here to address the absence from Trial of Dickson, any attorney representing Dickson, and any attorney representing the Corporate Defendants.  Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, BBCC, Cristen Dickson Nelson, Beau Nelson, and Colby Dickson originally were represented by Luke Dove ("Dove"), a Mississippi attorney who represented Dickson in his criminal proceedings and who also filed the Dickson and Corporate Defendants Answer in the Dickson Adversary Proceeding.

On May 15, 2017, Dove filed the Motion to Withdraw as Counsel (the "Motion to Withdraw") (D. Adv. Dkt. 203) for Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, BBCC, Cristen Dickson Nelson, Beau Nelson, and Colby Dickson.  On June 1, 2017, Dove filed the Supplemental Motion to Withdraw as Counsel (the "Supplemental Motion to Withdraw") (D. Adv. Dkt. 216), alleging that a conflict of

interest had arisen that prevented his continued representation of his clients and that the conflict "may be disclosed to the Court only *in camera*." (*Id.*) Dickson filed the Objection to Motion to Withdraw as Counsel (the "Objection") (D. Adv. Dkt. 217) on June 1, 2017. To remove the potential that any party would be prejudiced by the Court's *in camera* review of the evidence offered by Dove, the Court referred the Motion to Withdraw, the Supplemental Motion to Withdraw, and the Objection to Chief Bankruptcy Judge Katharine M. Samson for resolution. (D. Adv. Dkt. 219). On August 4, 2017, Judge Samson issued the Orders Allowing Withdrawal as Counsel (the "Withdrawal Orders"), which permitted Dove to withdraw as counsel. (D. Adv. Dkt. 238 & 239). Pursuant to the Withdrawal Orders, Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, BBCC, Cristen Dickson Nelson, Beau Nelson, and Colby Dickson had thirty (30) days to retain counsel.[11]

After the discovery period in the Dickson Adversary Proceeding expired on July 17, 2017 (D. Adv. Dkt. 221), and after the thirty (30)-day period to retain new counsel had elapsed on September 3, 2017, the Court held a status conference on September 18, 2017, for the purpose of setting a trial date. (D. Adv. Dkt. 245). Dickson's adult children, Colby Dickson and Cristen Dickson Nelson, and Dickson's son-in-law, Beau Nelson, appeared at the status conference without the assistance of counsel. Neither Dickson nor any attorney acting on his behalf or on behalf of the Corporate Defendants appeared at the status conference. Likewise, neither Rhodes nor any attorney acting on her behalf appeared at the status conference. The Trustee appeared at the status conference and was represented by Jeffrey R. Barber. Based on the preferences stated

---

[11] Dickson is no stranger to obtaining counsel to represent his individual and corporate interests. Dickson retained a personal attorney and multiple attorneys to represent CHFS in the Bankruptcy Case. Two attorneys represented Dickson in the criminal proceedings, and a Costa Rican attorney represented Dickson during his rogue operations.

by the parties and counsel in attendance, the Clerk of the Bankruptcy Court issued a notice (D. Adv. Dkt. 250), setting December 7-8, 2017, as the date of the Trial.

On October 10, 2017, Dickson filed the Motion to Extend Discovery Time and Allow Defendants Additional Time to Retain New Counsel ("Motion to Extend") (D. Adv. Dkt. 256). On October 12, 2017, the Court entered the Order Denying Motion to Extend Discovery Time and Allow Defendants [*sic*] Additional Time to Retain New Counsel ("Order Denying Motion") (D. Adv. Dkt. 257). In the Order Denying Motion, the Court noted that while Dickson has been incarcerated in a federal correctional facility, Dove represented Dickson in the Dickson Adversary Proceeding for almost three (3) years. The Court gave Dickson sufficient time to conduct discovery or retain new counsel before he filed the Motion to Extend. Moreover, Dickson could have filed the Motion to Extend before the Court set the Trial date.

On December 4, 2017, Dickson filed the Defendant and Defendants Representative Notice to Court Unable to Attend Trail [*sic*] (the "First Notice") (D. Adv. Dkt. 282). In the First Notice, Dickson alleged that he asked the "Hope Village Halfway House Case Manager" for permission to attend the Trial but had not yet received a response; his past furlough requests had been denied. (*Id.*) Additionally, Dickson contended that he is the corporate representative for the Corporate Defendants. In short, Dickson asked the Court to "consider the extreme hardship defendant has been placed in for past 45 months." (*Id.*) On December 5, 2017, the Court issued the Order Denying Defendant and Defendants Representative Notice to Court Unable to Attend Trail [SIC] (the "Order Denying First Notice") (D. Adv. Dkt. 283). In the Order Denying First Notice, the Court noted that Dickson had sufficient notice of the date of the Trial. Additionally, the Withdrawal Orders gave Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, BBCC, Cristen Dickson Nelson, Beau Nelson, and

Colby Dickson thirty (30) days to retain new counsel and to notify the Court of the same, but they failed to do so. Thus, the Court found that the First Notice appeared to be nothing more than Dickson's notification to the Court that he likely would not be present for the Trial.

On December 6, 2017, Dickson mailed the Defendant and Defendants Representative Unable to Attend Trial (the "Second Notice") to the Clerk of the Bankruptcy Court, and it was received and docketed in the Dickson Adversary Proceeding on December 11, 2017 (D. Adv. Dkt. 290). Dickson also sent a facsimile of the Second Notice to the Trustee on December 6, 2017. At the beginning of the Trial, counsel for the Trustee presented to the Court the faxed version of the Second Notice, which the Court marked as "Defendant's Exhibit D-1" for identification purposes only. In the Second Notice, Dickson alleged that his "furlough request" to appear at Trial was denied, he is the only officer and representative of the Corporate Defendants, his "release date" is May 3, 2018, and his case manager verbally relayed to the Court that she denied his furlough request. (*Id.*) Dickson asked the Court for an "opportunity to defend itself in these civil matters before this court at later date." (*Id.*) On December 12, 2017, the Court issued the Order Denying Defendant and Defendants Representative Unable to Attend Trial (the "Order Denying Second Notice") (D. Adv. Dkt. 292). In the Order Denying Second Notice, the Court found that, like the First Notice, the Second Notice appeared to be nothing more than Dickson's notification to the Court that he would not be present at Trial.

Indeed, Dickson and the Corporate Defendants did not retain counsel for the Trial. As a result, the Corporate Defendants were not permitted to appear at Trial without the assistance of counsel. *See Rowland v. Calif. Men's Colony*, 506 U.S. 194, 201-02 (1993); *Memon v. Allied Domecq QSR*, 385 F.3d 871, 873 (5th Cir. 2004) ("[A] corporation cannot appear in federal court unless represented by a licensed attorney."); MISS. BANKR. L.R. 9010-1(b)(2)(C). While Dickson

has maintained repeatedly in his pleadings that he is the representative of the Corporate Defendants, Dickson would not have been able to represent the Corporate Defendants at Trial, as he is not a licensed attorney. Dickson, in his individual capacity, however, could have appeared at Trial without counsel. He did not do so. Even if Dickson was unable to attend the Trial, the Court permitted him ample time to retain an attorney to represent his and the Corporate Defendants' interests at Trial. Again, he did not do so.[12]

It has not gone unnoticed that despite Dickson's recent requests for relief from this Court, Dickson, to this day, has not cooperated fully with authorities, has not turned over all necessary documents to the Trustee, has refrained from sharing computer passwords that safeguard relevant information to the Estate, and has not accounted for millions of dollars missing from the Estate. The "extreme hardship" that Dickson claims he "has been placed in for past 45 months" is a direct result of his international criminal conduct, voluntary guilty plea, and resulting federal incarceration. (D. Adv. Dkt. 282). In the interest of justice, the Dickson Adversary Proceeding, which had been pending for 42 months, needed to be tried after providing the parties with the required notice and an opportunity to be heard.

---

[12] In a separate federal civil action, Dickson requested and similarly was denied an extension of the discovery deadline by the U.S. District Court for the Southern District of Mississippi in *Edwards Family Partnership, LP v. Dickson*, Case No. 3:13-cv-00587-CWR-LRA, Dkt. 50. Dickson filed a motion to extend discovery in that case within weeks of the discovery deadline and almost seven (7) months after entry of a scheduling order. Among other reasons, Dickson claimed he was unable to develop critical expert witness testimony or deposition testimony before expiration of the discovery deadline. His request was denied as was his alternative request to continue the trial until after resolution of the criminal proceedings against him. "It is not within the Court's interest to reward Dickson additional discovery time at the expense of the resolution of this matter, without any showing on the part of the Defendant that he has not had a reasonable opportunity to conduct discovery." (*Id.* at 4-5). Likewise, this Court did not reward Dickson with additional time to obtain counsel and conduct discovery or grant a continuance of the Trial since Dickson was unable to show that he was not given a reasonable opportunity to obtain counsel, conduct discovery, and prepare for the Trial.

**Discussion**

A. **Counts 1 & 2: Federal and State RICO Violations**

1. **Federal Racketeer Influenced and Corrupt Organizations Act**

The Racketeer Influenced and Corrupt Organizations Act ("Federal RICO Act") prohibits the following activities:

> (a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

> (b)  It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c)  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d)  It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962.  In its Amended Complaint, the Trustee alleged that the Individual Defendants violated the Federal RICO Act "as persons employed by or associated with an enterprise that (a) attempted to fraudulently divert money from [CHFS's] bankruptcy estate through a pattern of racketeering activity; and (b) also conducted the affairs of [CHFS] through a pattern of racketeering activity."  (Amended Complaint at 20).  Additionally, the Trustee alleged that the Individual Defendants conspired to commit the prohibited activities outlined in the Federal RICO Act.  (*Id.*).  At Trial, the Trustee presented evidence in support of a pattern of racketeering activity

that violated 18 U.S.C. §§ 152, 1341, 1342, 1343, and 1344, which comprise predicate acts under the Federal RICO Act.  The evidence is recounted below under headings that clarify the timing of these events.

### a.   Post-Petition, Pre-Trustee Events

On May 23, 2012, CHFS filed a petition for relief under chapter 11 of the U.S. Bankruptcy Code and thereafter operated as a CHFS in possession.  (Bankr. Dkt. 1).  CHFS was a Delaware corporation registered to do business in Mississippi and engaged in interstate commerce by purchasing and servicing loan portfolios located in several states.  (Bankr. Dkt. 167).  Dickson directed and controlled CHFS's business affairs.  (*Id.*).  Other than limited carve-outs for operating and other expenses, the funds in CHFS's debtor-in-possession bank accounts at Wells Fargo (the "DIP Accounts") were not to be disbursed except upon further order of the Court (the "Cash Collateral Orders") (Bankr. Dkt. 60 & 231; D. Exs. P-16 & P-17).  CHFS's October 2013 monthly operating report (D. Ex. P-5; Bankr. Dkt. 416), the last one filed by CHFS as a debtor in possession, showed an ending cash balance of $9,059,191.49 in the various accounts established by the Cash Collateral Orders.  Beginning in the fall of 2013, Dickson began his scheme to empty the Estate of substantially all of its assets.  The following facts were established at Trial:

1.      On October 29, 2013, without Court approval, Dickson executed a request to change CHFS's ACH deposit arrangement with Advantage.  The deposit arrangement was changed from CHFS's account at BancorpSouth to Victory Consulting's account at Wells Fargo.  (D. Ex. P-20).

2.      In November of 2013, Dickson arranged for James Mike Meehan ("Meehan"), a United States citizen residing in Costa Rica, to utilize Meehan's call center in Costa Rica, Advanced Communications, S.A. ("ADCOM"), to service CHFS's loans from Costa Rica.  (D.

Ex. P-21).   To facilitate that arrangement, Dickson purchased Voice over Internet Protocol telephones in November of 2013 with Iowa area codes and had them shipped initially to BBCC's location in Mississippi.  (D. Ex. P-18).  The Trustee testified that the telephones were then shipped from Mississippi to Costa Rica and used in the ADCOM operation.  The Trustee later recovered those telephones from Meehan.  Thus, CHFS's borrowers would receive telephone calls from CHFS in Costa Rica but an Iowa area code would appear on their caller ID.

3.     Dickson moved furniture and equipment from the Jackson Office to Costa Rica. For example, an international Federal Express ("FedEx") waybill from December of 2013, signed by Rhodes, described the shipping of "office equipment" to Bernal Chavarria ("Chavarria"), Dickson's attorney in Costa Rica.  (D. Ex. P-24).

4.     In violation of the Cash Collateral Orders, Dickson caused the sums in the DIP Accounts to be removed and transferred to some of the Corporate Defendants and other insiders and/or affiliates of CHFS.  There were four wire transfers totaling $8,395,000 to the account of the Warren Foundation at Banco Panameño in Panama, and one wire transfer totaling $700,000 to the account of Victory Consulting.   Additionally, there were wire transfers from Victory Consulting's account at Wells Fargo to the RE&B Investment Trust account at Scotia Bank in Costa Rica totaling $1,325,000 and to the Warren Foundation account totaling $450,000.  (D. Ex. P-36 at 11-12).

5.     In mid-December of 2013, Dickson caused employees of CHFS to file notices in at least five (5) chapter 13 cases in other jurisdictions requesting that chapter 13 payments owed to CHFS be sent to the Las Vegas P.O. Box, which was controlled by Dickson and not previously disclosed to this Court.  (D. Ex. P-30).

The Trustee testified that CHFS's chapter 11 bankruptcy counsel, Henderson, was unaware of the aforementioned activities at the times they occurred.  On December 20, 2013, after learning of these activities, and based on information provided to him, Henderson filed the Disclosure in the Bankruptcy Case indicating that: (1) CHFS changed its principal place of business to Panama; (2) CHFS had transferred funds from the DIP Accounts to CHFS's bank accounts in Panama; and (3) CHFS continued to service its business operations in Panama and Costa Rica.  Contrary to the Disclosure and unbeknownst to Henderson, however, the funds were not transferred to CHFS's accounts.  Instead, the funds were transferred from the DIP Accounts directly (or indirectly through Victory Consulting) to the account of the Warren Foundation at Banco Panameño in Panama.  (D. Ex. P-36 at 11-12).

Because of the Disclosure, the U.S. Trustee filed the United States Trustee's Emergency Motion for Order for the Appointment of a Chapter 11 Trustee (Bankr. Dkt. 427).  Pursuant to the Order Granting United States Trustee's Emergency Motion for Order for the Appointment of a Chapter 11 Trustee (Bankr. Dkt. 429) entered on December 23, 2013, the Court directed the U.S. Trustee to appoint a trustee, subject to Court approval.  Thereafter, the U.S. Trustee filed the United States Trustee's Application for Approval of Chapter 11 Trustee (Bankr. Dkt. 455), which the Court granted on January 21, 2014, approving the U.S. Trustee's appointment of the Trustee for the Estate (Bankr. Dkt. 473).

### b.    Post-Petition, Post-Trustee Events

At Trial, the Trustee testified that only approximately $7,500 remained in CHFS's bank accounts at the time of her appointment.  (D. Adv. Dkt. 296 at 52).  After the Court ordered the appointment of the Trustee, Dickson continued to transfer CHFS's business and assets within the

United States, between the United States and Latin America, and within Latin America, as evidenced by the following facts:

1.      A DHL Express invoice dated January 17, 2014, reflects the shipment of "dox" (presumably, an abbreviation for "documents") from Vanessa Escobar ("Escobar") in Panama City, Panama to "Community Home Financial Services Inc." at a Costa Rica address. (D. Ex. P-52). Escobar was "Foundation Counsel" to the Warren Foundation. (D. Ex. P-33 at 1).

2.      The Trustee testified that, on January 31, 2014, Runnels, operating under Dickson's instructions, denied the Trustee access to the Jackson Office, claiming that CHFS's lease terminated three weeks beforehand. (D. Adv. Dkt. 296 at 67-68). When the Trustee returned to the premises on February 3, 2014, the offices previously occupied by CHFS and its affiliates were dark, files and other items had been removed, and items that could be seen hanging on the walls the prior week had been removed.

3.      In March of 2014, Dickson caused additional equipment and office furniture from the Jackson Office to be delivered to Costa Rica. (D. Ex. P-34).

4.      Dickson caused letters to be sent to borrowers of CHFS with pre-addressed envelopes advising borrowers to send their payments to the Las Vegas P.O. Box. After the Trustee obtained control of the Las Vegas P.O. Box, borrowers were advised to send their payments to Community Home Financial Services, Inc., Global World Link, 8610 NW 72 Street, Pty. #725, Miami, Florida 33166. (D. Ex. P-23). Once checks were remitted to either location, they were shipped to Costa Rica or Panama. (D. Ex. P-43 at 4-5, ¶¶16-17; at 10-11, ¶ 17).

5.      Rhodes notarized a subordination agreement purportedly on behalf of CHFS on January 31, 2014 (D. Ex. P-49) and a loan modification agreement on February 25, 2014 (D. Ex. P-23 at 11).

6.      Dickson caused "dunning" letters to be sent to borrowers alleged to be behind in their payments after automatic draft payments were stalled through no fault of the borrowers.  (D. Ex. P-23).

7.      As demonstrated by the ADCOM call logs (D. Ex. P-31), telephone calls were made to borrowers asking them for electronic payment information or otherwise defrauding borrowers by alleging that CHFS's computer servers were "down" and that payments had to be made by a method other than electronic transfer.  In at least one such call, the borrower was told that CHFS was not in bankruptcy but, "healthy and strong."  (D. Ex. P-22).  Borrowers also were advised to make payments through CHFS's website.  (D. Ex. P-43 at 4-5, ¶16).

8.      One borrower provided the Trustee a copy of his bank statement showing a March 7, 2014, debit for his payment to CHFS by "Brookwood Byram Co., Byram, MS" (D. Ex. P-32), indicating that BBCC was part of the scheme.

9.      FedEx packages were exchanged between the Jackson Office and CHFS's Costa Rica location, or to Chavarria, through at least February of 2014.  (D. Ex. P-24).  Moreover, Dickson sent an e-mail to CHFS's registered agent for service of process on February 10, 2014, directing the registered agent to use DMI's United Postal Service (UPS) account number to ship CHFS's mail to "William D. Dickson c/o Xinia Avila Esquivel, Oficentro La Sabana Edif., 7 Planta Baja, San Jose, Costa Rica."  (D. Ex. P-25).

10.      In March of 2014, checks were delivered to the Trustee's office by Colby Dickson, Dickson's son, made payable to CHFS but endorsed by Dickson, allegedly on behalf of CHFS, and noted for deposit into a Dickson Enterprises account at OmniBank.  (D. Adv. Dkt. 296 at 83-85).  The envelopes for these checks already had been opened and removed, and the checks had been processed for deposit.  At the time, Dickson was in Panama or Costa Rica.  Checks collected

after the Trustee's appointment were sent to Dickson using CHFS's FedEx account, endorsed, and then returned to the United States by FedEx for deposit.

11.     As late as April of 2014, funds that should have been directed to the Trustee continued to be deposited in Victory Consulting's account at Wells Fargo pursuant to, among other things, the change of the Advantage ACH deposit agreement from CHFS's accounts with BancorpSouth to the Victory Consulting accounts at Wells Fargo.  (D. Ex. P-20).  Further, borrowers continued to make payments on loans being serviced by CHFS through Western Union that should have been remitted to the Trustee.  (D. Ex. P-31 at 67, 72, 362, 365 & 430).

12.     The Trustee testified that Dickson caused title companies to make payoff checks payable to Banco Panameño in Panama.  Banco Panameño would then return the check, contact the title company or its bank, and request that the funds be wire transferred.  In the same vein, Runnells, employed at the time by CHFS and/or DMI, went to a BancorpSouth branch, with funds from a DMI account, and purchased a BancorpSouth Official Check Number 2203001 dated January 29, 2014, payable to CHFS, in the amount of $300,000.  (D. Ex. P-26).  The check was later returned by Banco Panameño to BancorpSouth pursuant to an International Collection Letter dated March 6, 2014, enclosing Check Number 2203001 for $300,000 drawn on BancorpSouth and made payable to CHFS with the request that the proceeds reflected by the check be wire transferred to HSBC for credit to an account with Banco Panameño.  Banco Panameño purported to be acting as the "agent for our client," which would have been CHFS as the payee of the check. (D. Ex. P-27).  Additionally, the ADCOM call logs reflect that borrowers were encouraged or directed to send payments by means of Western Union and various ACH vendors.  (D. Ex. P-31 at 67, 362, 365 & 430).

13.     Dickson caused bank accounts to be opened in CHFS's name in Panama and Costa Rica.  (D. Ex. P-50).

14.     At Trial, the Trustee testified that she began contacting borrowers shortly after her appointment and sent letters to as many borrowers as she could identify with the limited information available to her, advising that future payments be remitted to her.  The activities of the Individual Defendants and the Corporate Defendants, according to the Trustee, caused confusion and mistrust among many borrowers as to the correct party to pay.  Many borrowers stopped making payments altogether.

### c.     Combined Pre-Petition and Post-Petition Events

Through at least January of 2014, DMI, DHMI, Victory Consulting, Crisco, Double S, and Dickson Enterprises were all located in the same office space and in the same building as CHFS at the Jackson Office.  (D. Adv. Dkt. 273).  In fact, not only did DMI, DHMI, Victory Consulting, Crisco, and Double S share the same office space with CHFS, but they also shared in whole or in part the same employees as CHFS and used such employees to function on a regular basis.  (*Id.*) These companies had continuous access to CHFS's bank accounts, books, records, computers, and other proprietary information through Dickson.

Both pre-petition and post-petition, Dickson caused to be transferred to insiders and/or affiliates of CHFS, including DMI and DHMI, loans that previously may have been owned by CHFS (the "Loan Transfers").  CHFS's servers show evidence of such transfers, including documents with handwritten notations to move certain loans from one server to another.  (D. Ex. P-28).  Other documents on the server allegedly intended to record DHMI loans show the "investor" to be CHFS or loans serviced in connection with entities other than DHMI.  (D. Ex. P-28).

Additionally, Dickson, through Phalanx and/or Philanfin, used an undetermined amount of CHFS funds to purchase loans in Costa Rica. (D. Ex. P-29). Dickson also used funds commingled with CHFS funds to purchase a condominium in Los Sueños, Costa Rica. (D. Ex. P-51). The undetermined amount of Costa Rica loans, the condominium, and $587,749.45 seized by the Costa Rican government are the subject of a Second Amended Final Order of Forfeiture (D. Ex. P-1) in Dickson's criminal proceeding.

### d.      Dickson's Arrest and Subsequent Conviction

On March 10, 2014, a criminal complaint (D. Ex. P-42) was filed against Dickson (the "Criminal Proceeding").[13] At Trial, the Trustee testified that in early March of 2014, Dickson traveled to Panama to deposit mortgage-payment checks into Panamanian bank accounts. While *en route* to Costa Rica, Dickson was detained and deported to the United States. Upon his return to the United States, Dickson was arrested for bank fraud and held without bond. An indictment was issued against Dickson on April 9, 2014. (D. Ex. P-43).

On July 10, 2014, $3,099,154.09 were wire transferred to the Trustee from a CHFS account at Banco Panameño. (D. Ex. P-36 at 12). On that same day, $1,824,871.49 were wire transferred to the Trustee from a "Dickson William D" account at Banco Panameño. On April 3, 2015, $566,106.61 were wire transferred to the Trustee from a CHFS account at Banco Panameño. The Trustee also intercepted a $300,000 cashier's check from BancorpSouth made payable to CHFS and dated January 29, 2014. The Trustee intercepted a $240,000 cashier's check from a W.D. Dickson account at OmniBank, made payable to CHFS and dated February 25, 2014. (D. Exs. P-36 at 12-13, P-44 at 3).

---

[13] *United States v. Dickson*, No. 3:14-cr-00078-TSL-FKB (S.D. Miss. 2014).

In the Criminal Proceeding, Dickson pled guilty on May 5, 2015, to Counts 5 and 20 of an indictment (D. Exs. P-3 & P-43) charging Dickson with criminal concealment of assets and false oaths and claims, in violation of 18 U.S.C. §§ 152(5), (2).  (D. Ex. P-3).  The facts set forth or incorporated by reference in those two counts of the indictment are:

> 1.  Community Home Financial Services, Inc. (CHFS) was a privately owned company engaged in the business of mortgage lending and servicing. CHFS principal place of business was in the Southern District of Mississippi, located at 234 E. Capitol Street, Jackson, Mississippi, until on or about December 20, 2013.
>
> 2.  The defendant, WILLIAM DAVID DICKSON, a/k/a Butch Dickson, was the President and Director of CHFS.
>
> 3.  On or about May 23, 2012, CHFS filed for Bankruptcy in the United States Bankruptcy Court for the Southern District of Mississippi, in Chapter 11, Case No. 12-01703-EE.  Defendant WILLIAM DAVID DICKSON, a/k/a Butch Dickson signed the Statement and Schedules for CHFS, swearing the information to be true.
>
> 4.  The Bankruptcy Court had exercised its authority over the assets of CHFS, including cash collateral and accounts receivables, and had expressly forbidden the use, expenditure or dissipation of any of the assets of CHFS without prior approval of the Bankruptcy Court.
>
> 5.  Wells Fargo bank was a financial institution, the accounts and deposits of which were insured by the Federal Deposit Insurance Corporation.  Wells Fargo Bank was an organization whose normal activities took place in interstate and foreign commerce and which had an effect on interstate and foreign commerce.
>
> 6.  Pursuant to Bankruptcy Court orders, several escrow accounts were held at Wells Fargo for the purpose of collecting and retaining the cash collateral of CHFS, for the benefit of its creditors.  The relevant escrow accounts were:

| ACCOUNT NAME | FOR THE PURPOSE OF: |
| --- | --- |
| CHFS Debtor In Possession operating account (DIP) ending in #9425 | Paying court approved expenses of CHFS |
| EFP funds account ending in #9335 | Funds subject to a dispute between CHFS and the Edward Family Partnership |
| BHT funds account ending in #9343 | Funds subject to a dispute between CHFS and the Beher Holdings Trust |

> 7.  Banco Panameno was a financial institution located in the country of Panama.

8.  The defendant, WILLIAM DAVID DICKSON, a/k/a Butch Dickson, controlled an account at Banco Panameno held in the name of the W.W. Warren Foundation.

9.  The defendant, WILLIAM DAVID DICKSON, a/k/a Butch Dickson, operated and controlled a company named Victory Consulting Group, Inc. (VCG).

\*        \*        \*

[**COUNT 5**]

22.  On or about the dates listed below, in Hinds County in the Northern Division of the Southern District of Mississippi, the defendant, WILLIAM DAVID DICKSON, a/k/a Butch Dickson, knowingly and fraudulently received from CHFS, Debtor, in the case filed May 23, 2012, under Title 11 of the United States Code and styled "In the matter of Community Home Financial Services, Inc., Debtor," Bankruptcy Docket No. 12-01703-EE, a material amount of property, that is approximately $9,095,000 held in various bankruptcy escrow accounts, with intent to defeat the provisions of Title 11.

| COUNT | DATE | APPROXIMATE AMOUNT | FROM | TO ACCOUNT |
|-------|------|--------------------|------|------------|

[Counts 2-4 and 6-7 omitted]

| 5 | 12/11/2013 | $3,500,000.00 | EFP Escrow | W.W. Warren at Banco Panemeno |
|---|------------|---------------|------------|-------------------------------|

\*        \*        \*

All in violation of Sections 152(5) and 2, Title 18, United States Code.

\*        \*        \*

[**COUNT 20**]

35.  On or about the dates listed below, in Hinds County in the Northern Division of the Southern District of Mississippi and elsewhere, the defendants, WILLIAM DAVID DICKSON, a/k/a Butch Dickson and COLBY DICKSON, aided and abetted by others known and unknown to the grand jury, knowingly and fraudulently conceal property belonging to CHFS, Docket No. 12-01703-EE, from the trustee charged with control of the Debtor's property and from the creditors and the United States Trustee.

| COUNT | CHECK DATE | DATE POSTED | PAYEE | ACCOUNT DEPOSITED INTO |
|---|---|---|---|---|
| 20 | 2/6/2014 | 3/7/2014 | Community Home Financial Service, Inc. | OmniBank Account #22484, held in the name of W.D. Dickson Enterprises Inc. |

[Counts 21-25 omitted.]

All in violation of Sections 152(1) and 2, Title 18 United States Code.

(D. Ex. P-43); *see* First Superseding Indictment, *United States v. Dickson*, No. 3:14-cr-00078 (S.D. Miss. Feb. 18, 2015).   The portions of 18 U.S.C. § 152 that Dickson pled guilty to violating provide:

> A person who—
>
> (1) knowingly or fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;
>
> (2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;
>
> \*          \*          \*
>
> (5) knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;
>
> \*          \*          \*
>
> shall be fined under this title, imposed not more than 5 years, or both.

*See* 18 U.S.C. § 152.  The Court gives collateral estoppel effect to the above-referenced facts to which Dickson pleaded guilty.  *See Breeland v. Security Ins. Co. of New Haven*, 421 F.2d 918, 922 (5th Cir. 1969) (noting the "number of jurisdictions holding that a criminal conviction precludes litigation of the same issue in a civil suit is ever increasing"); *United States v. Shaw*, 725 F. Supp. 896 (S.D. Miss. 1989); *State Farm & Cas. Co. v. Dunn (In re Dunn)*, 95 B.R. 414, 417 (Bankr.

N.D. Miss. 1988) (applying collateral estoppel effect to arson conviction in criminal proceeding on debtor's willful and malicious injury to another's property).

An Agreed Order on Restitution (the "Restitution Order") (D. Exs. P-2 & P-44) was entered on September 13, 2016, ordering Dickson to pay restitution in the amount of $5,422,004.58. The restitution calculations provided that losses to the Estate for criminal purposes amounted to $12,145,842.36. This amount included: (a) $9,095,000 transferred from DIP Accounts; (b) $1,345,462.46 diverted to Victory Consulting's Wells Fargo account; (c) CHFS checks deposited with OmniBank; and (d) proceeds from November of 2013 to April of 2014 "as the result of the diversion of proceeds from electronic deposits." Dickson was then given credit for the following amounts intercepted by the Trustee or voluntarily remitted by Dickson: (a) $300,000 from a BancorpSouth check; (b) $250,000 from an OmniBank check; (c) $5,898,278.29 wire transferred from Panama; (d) $144,191.90 from the Coastal Condos sale; and (e) $111,367.59 from the Willow Court sale. Consequently, Dickson was ordered to pay restitution of $5,442,004.58. The restitution award did not, however, address the pre-petition transfers or the additional amounts that the Trustee contends Dickson owes to the Estate. The Trustee submitted a Victim Impact Statement in the Criminal Proceeding in which she alleged that the total losses to the Estate exceeded $16,454,339. (D. Ex. P-4).

### e.    Testimony of Rhodes

Rhodes appeared at Trial without the assistance of counsel. She testified that she worked for the Dickson family for about sixteen (16) years. (D. Adv. Dkt. 296 at 128). Colby Dickson hired her as a loan processor in 1999 for DMI. (D. Adv. Dkt. 296 at 129). Then she started working in the collections department of CHFS in 2000 or 2001, shortly after Dickson and Frank Jackson purchased CHFS. (D. Adv. Dkt. 296 at 130). Rhodes' income tax returns indicated that

CHFS employed her during the years of 2001 through 2014. (D. Adv. Dkt. 272-4, Ex. D). Rhodes stated that "[b]y working under a dictatorship, I've only gone to work, to work for me an[d] my sons. It was nothing extra given to me." (D. Adv. Dkt. 296 at 128-29). In short, Rhodes argued that she became involved with the Dickson family not knowing their true intentions and, as a result, "got trapped." (D. Adv. Dkt. 296 at 129).

When questioned as a hostile witness by the Trustee about an e-mail she allegedly sent on behalf of CHFS showing, in the signature block, that CHFS's office was located in and/or operating out of Miami, Florida, Rhodes told the Court that "[t]his is also the e-mail address that Butch [Dickson] and the guys were using when they were over in Costa Rica. So I can't say for certain that this was an e-mail that I was actively using at that time." (D. Adv. Dkt. 296 at 115-16). Rhodes testified that she flew to Costa Rica on February 26, 2014 and did not send any e-mails while outside of the United States. The Trustee then inquired whether Rhodes knew that other people were using her e-mail address, and Rhodes replied, "No, ma'am, because after—I didn't—when I took that hard drive over there to Costa Rica, I did not know what was on it. When I took that hard drive, I didn't know that everything was coming up with my information. But the guy Brian Nichols did tell me that he was using all of my information to send literature to the customers." (D. Adv. Dkt. 296 at 116). Rhodes testified that she did not object to Brian Nichols using her e-mail address because she was no longer using that account. (D. Adv. Dkt. 296 at 117). Additionally, Brett Harrison, a computer consultant hired by CHFS, was supposed to remove Rhodes' personal information from her e-mail account. (D. Adv. Dkt. 296 at 126).

Later, the Trustee asked Rhodes when she learned about CHFS's bankruptcy filing. Rhodes testified that she learned about CHFS's bankruptcy filing on her second trip to Costa Rica in early March 2014 after speaking to Kathleen Payne, a manager of the loans over Blue World

Pools in Atlanta, Georgia.  (D. Adv. Dkt. 296 at 121).  In response, the Trustee asked Rhodes to clarify her deposition testimony as to whether she learned about CHFS's bankruptcy filing on her first or second trip to Costa Rica.  Rhodes testified, "I'm saying it was my second trip because after I was notified that Dickson had filed, that he was actually in a bankruptcy that is when I did not go back to Costa Rica."  (D. Adv. Dkt. 296 at 120).  Rhodes further testified that she asked Dickson in Costa Rica if CHFS was in bankruptcy, and he denied it.  (D. Adv. Dkt. 296 at 121). "I never had an opportunity to open a piece of mail to know that [CHFS] was in a bankruptcy." (D. Adv. Dkt. 296 at 129).

With respect to Rhodes' activities in Costa Rica, the Trustee instructed Rhodes to examine an invoice dated February 27, 2014, from FedEx.  (D. Ex. P-24 at 23; D. Adv. Dkt. 296 at 122). The invoice indicated that Rhodes was the sender of a shipment from CHFS's address in Costa Rica, the recipient of the shipment was Dickson at the Jackson Office, and the shipping date was January 28, 2014.  (D. Ex. P-24 at 25).  Rhodes testified that she was not physically present in Costa Rica on January 28, 2014, when the package was shipped and did not know that FedEx packages were being sent under her name.  (D. Adv. Dkt. 296 at 122).  Additionally, at the direction of Colby Dickson, Rhodes brought a hard drive from Mississippi to Costa Rica.  (D. Adv. Dkt. 296 at 126-27).  Rhodes testified that she did not know what information was on the hard drive; she was simply told to "[t]ake it to dad."  (D. Adv. Dkt. 296 at 126-27).  Rhodes also testified that she never was told the passwords to gain full access to the data on CHFS's computer servers.  (D. Adv. Dkt. 296 at 127).

On her first trip to Costa Rica, Rhodes testified that she was surprised to find a fully operational call center collecting payments on behalf of CHFS.  (D. Adv. Dkt. 296 at 124).  When Rhodes arrived in Costa Rica, Xinia Maria Esquivel, known as "Nina," picked her up from the

airport and took her to the call center office where "different people [were] doing marketing with security systems and Butch [Dickson] had a certain small section with these guys that's on the phones, mail outs [to borrowers], and doing everything in the location."  (D. Adv. Dkt. 296 at 125). Rhodes testified that she did not know how CHFS processed postage from its location in Costa Rica for the "mail outs" to borrowers, but she "would see them printing statements" with the Las Vegas P.O. Box on the return envelopes.  (D. Adv. Dkt. 296 at 125).  On her second trip to Costa Rica, Rhodes was asked specifically to work with Rick Felton ("Felton").  Rhodes testified that Dickson hired Felton to oversee the loan collectors.  At Dickson's direction, Rhodes traveled to Costa Rica to assist Felton with collection protocols because Dickson believed Felton was using incorrect terminology when communicating with customers.

### f.      Liability of the Individual Defendants under the Federal RICO Act

Because neither Dickson nor anyone on Dickson's behalf appeared at Trial, the Trustee's testimony and evidence introduced at Trial remains uncontradicted.  As a result, the Court finds that Dickson, while employed by or associated with CHFS, fraudulently diverted money from the Estate and conducted the affairs of CHFS through a pattern of racketeering activity.  The Trustee is entitled to all appropriate relief against Dickson under the Federal RICO Act.  The Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339.  After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and adding Trustee's fees, ClearSpring Loan Services, Inc.[14] ("ClearSpring")'s servicing fees, and other Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of

---

[14] ClearSpring changed its name to Sortis Financial Inc., effective January 1, 2018.  *See* Global Op. at 65 n.27.

$13,485,492 as of the date of Trial.[15]  Accordingly, the Trustee is entitled to a judgment against Dickson for the amount of $13,485,492, trebled,[16] together with post-judgment interest at the legal rate until satisfied.

Regarding the allegation against Rhodes, counsel for the Trustee explained to the Court during closing argument,

> [W]e appreciate all that Ms. Rhodes has said.  Perhaps she was caught between a rock and a hard place, but as the documents speak, the trustee felt she had no choice but to keep Ms. Rhodes in the case, particularly since she physically, you know, went to Costa Rica, was physically involved in the process, notarized documents, et cetera.  So this is not an attempt to take advantage of her or anything else.  This is simply the trustee trying to pursue her fiduciary duties to the estate.

(D. Adv. Dkt. 296 at 131).  After fully considering the matter, the Court finds that the Trustee did not meet her burden of proof with respect to Rhodes, under the Federal RICO Act.

### 2.    Mississippi Racketeering Act

The Mississippi Racketeering Act prohibits the following activities:

> (1)  It is unlawful for any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds or the proceeds derived from the investment or use thereof, in the acquisition of any title to,

---

[15] In the PTO, the Trustee requested a different amount in damages.  (PTO at 26).  At the beginning of Trial, counsel for the Trustee informed the Court, "[t]his morning we discovered that our damage calculations are actually in error.  We accidentally added some numbers together that didn't need to be."  (D. Adv. Dkt. 296 at 15).  Counsel for the Trustee requested, and the Court granted him permission to revise the Plaintiff's Proposed Findings of Fact and Conclusions of Law (D. Adv. Dkt. 299 at 24) to correct the calculation of damages.  The award of $13,485,492 reflects the revised damage calculations included in the Plaintiff's Proposed Findings of Fact and Conclusions of Law.

[16] *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .").

or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

(2)  It is unlawful for any person, through a pattern of racketeering activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

(3)  It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.

(4)  It is unlawful for any person to conspire to violate any of the provisions of subsections (1), (2), or (3) of this section.

MISS. CODE ANN. § 97-43-5.  In its Amended Complaint, the Trustee asserted that the Individual Defendants violated the Mississippi Racketeering Act by "conduct[ing] the affairs of [CHFS] through a pattern of racketeering activity . . . and . . . conspir[ing] to violate these provisions . . . by seeking through their scheme to obtain control of assets of the bankruptcy estate."  (D. Adv. Dkt. 33 at 27).  At Trial, the Trustee presented to the Court the evidence detailed in Count 1, *supra*, in support of a pattern of racketeering activity that violated Mississippi Code §§ 97-21-3, 97-21-51, 97-9-69, and 97-9-71, which comprise predicate acts under the Mississippi Racketeering Act.

After fully considering the matter, the Court finds that the Trustee met her burden of proof with respect to Dickson but not with respect to Rhodes.  The Trustee is entitled to all appropriate relief against Dickson under the Mississippi Racketeering Act.  As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339.  After subtracting credits to Dickson per the Restitution Order (D. Ex. P-2, P-44) in the amount of $6,703,837.78 and after adding Trustee's fees, ClearSpring's servicing fees, and other Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of

$13,485,492 as of the date of Trial.[17]  Accordingly, the Trustee is entitled to a judgment against Dickson for the amount of $13,485,492, trebled,[18] together with post-judgment interest at the legal rate until satisfied.

## B.    Count 3: Tortious Interference with Contract

Under Mississippi law, "[w]hen a person causes another to breach a contract with some third person, the tort is one of interference with performance of a contract."  *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998).  The elements for the tortious interference with performance of a contract are:

> 1. that the acts were intentional and willful;
>
> 2. that they were calculated to cause damage to the plaintiffs in their lawful business;
>
> 3. that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and
>
> 4. that actual damage and loss resulted.

*Cenac v. Murry*, 609 So. 2d 1257, 1268-69 (Miss. 1992) (citing *Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986)).  With respect to the first element, a showing of specific intent is not required.  Instead, "the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract."  *Liston*, 659 F. Supp. at 281.

---

[17] *See supra* note 15.

[18] *See* MISS. CODE ANN. § 97-43-9(6) ("Any person who is injured by reason of any violation of the provisions of this chapter shall have a cause of action against any person or enterprise convicted of engaging in activity in violation of this chapter for threefold the actual damages sustained and, when appropriate, punitive damages. Such person shall also recover attorney's fees in the trial and appellate courts and costs of investigation and litigation, reasonably incurred.").

Additionally, the plaintiff must prove the following: (1) "that an enforceable obligation existed between the plaintiff and another party," and (2) "that the contract would have been performed but for the alleged interference." *Par Indus., Inc.*, 708 So. 2d at 48.

At Trial, the Trustee testified that CHFS serviced loans for borrowers pursuant to various agreements. Because Dickson is the officer, director, and/or person in control of the Corporate Defendants, Dickson and the Corporate Defendants knew of the contracts between CHFS and the borrowers. Nevertheless, as described in the Post-Petition, Pre-Trustee Events; Post-Petition, Post-Trustee Events; and the Combined Pre-Petition and Post-Petition Events, *supra*, Dickson and the Corporate Defendants contacted borrowers to divert money away from CHFS and to Dickson and/or the Corporate Defendants. The Court finds that Dickson's and the Corporate Defendants' actions were intentional and done for the purpose of harming the Estate by depriving it of income. The Court further finds that the Trustee is entitled to a judgment against Dickson and the Corporate Defendants for tortiously interfering with CHFS's contracts with its borrowers. As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339. After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding additional Trustee's fees, ClearSpring's servicing fees, and additional Estate professional fees and expenses, the Estate has been damaged in the amount of $13,485,492 as of the date of Trial.[19] Accordingly, the Trustee is entitled to a judgment against Dickson and the Corporate Defendants, jointly and severally, in the amount of $13,485,492, together with post-judgment interest at the legal rate until satisfied.

---

[19] *See supra* note 15.

C.        **Counts 4 & 7: Actual Fraudulent Transfers under State and Federal Law**

1.        **Avoidance of Pre-Petition Transfers under Mississippi Law**

Under § 544(a), the Trustee may avoid pre-petition transfers that could have been avoided by a hypothetical lien creditor that: (a) advanced credit to CHFS as of the petition date and obtained, at exactly the same time, and with respect to such credit, a judgment lien on all property of CHFS that could have been obtained by a creditor on a simple contract; or (b) advanced credit to CHFS as of the petition date and obtained, at exactly the same time, and with respect to such credit, an execution against CHFS that is returned unsatisfied. Alternatively, the Trustee may avoid pre-petition transfers that could have been avoided by a hypothetical bona fide purchaser of real property (other than fixtures) from CHFS against whom Mississippi law permits such transfer to be perfected and that has, as of the petition date, perfected such transfer. Under § 544(b), the Trustee has the powers of an actual creditor with an allowable unsecured claim that could have avoided a transfer of CHFS's property or any obligation of CHFS under Mississippi law.

Pursuant to the Mississippi Fraudulent Transfer Act:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor.

MISS. CODE ANN. § 15-3-107(1). In determining fraudulent intent, the Court may consider the following "badges of fraud":

> (a) The transfer or obligation was to an insider;
>
> (b) The debtor retained possession or control of the property transferred after the transfer;
>
> (c) The transfer or obligation was disclosed or concealed;

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred;

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor;

(l) The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (ii) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due;

(m) A transfer made or obligation incurred by a debtor may be fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation; and

(n) A transfer made by a debtor may be fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

MISS. CODE ANN. § 15-3-107(2); *see Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1066-67 (5th Cir. 2008).  Finally, "[i]f there exists a combination of facts such as described in subsection (2)(*1*), (m) or (n) only, then there will be a strong presumption of fraud which can be rebutted only by clear and convincing evidence."  MISS. CODE ANN. § 15-3-107(3).

According to the Disclosure Statement of CHFS (Bankr. Dkt. 167 at 9), "CHFS is in the business of purchasing and servicing loan portfolios consisting of mostly Class B loans of 2nd to 3rd mortgages."  In 2011, a dispute arose between CHFS and its president, Dickson, on the one hand, and Dr. Charles C. Edwards ("Dr. Edwards"), Edwards Family Partnership, LP ("EFP"), and Beher Holdings Trust ("BHT"), on the other hand.  On February 15, 2012, CHFS and Dickson initiated state court litigation against Dr. Edwards, EFP, and BHT that was removed to the U.S. District Court for the Southern District of Mississippi on April 11, 2012.  *See Cmty. Home Fin. Servs., Inc. v. Edwards Family P'ship, LP*, No. 3:12-cv-00252-CWR-LRA (S.D. Miss.) (the "Receivership Action").  Dr. Edwards, EFP, and BHT asserted counterclaims against CHFS and Dickson in the Receivership Action.  (D. Ex. P-38).[20]

At Trial, the Trustee testified that CHFS was not primarily in the business of making loans to third parties pre-petition.  Nevertheless, CHFS made substantial pre-petition transfers.  Over the course of three months, CHFS transferred $3,200,000 through a series of promissory notes— Dickson Note, Double S Note 1, DMI Note 1, Dickson Enterprises Note, Double S Note 2, Crisco Note 1, Crisco Note 2, and DMI Note 2.  After the Warren Foundation was established in Panama on March 1, 2012 (D. Ex. P-33 at 1), substantially all of the $3,200,000 were transferred to the

---

[20] *See* Global Op. at 45-46.

Warren Foundation.[21]  The funds either were transferred to Warren Foundation directly, or were first transferred to Victory Consulting, which then transferred substantially all of the funds to the Warren Foundation.   In total, CHFS transferred approximately $3,700,000, including the $3,200,000 referenced above, to accounts of Victory Consulting and Warren Foundation (the "Pre-Petition Transfers").  (D. Exs. P-36 at 10-11 & P-39).

The Corporate Defendants admitted that Dickson was an officer, director, and/or person in control of the Corporate Defendants at all relevant times.  (D. Adv. Dkt. 273).  As a result, Dickson's intent may be imputed to the Corporate Defendants.  *See* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][b][iv] (16th ed. 2016) ("[T]he fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation. This is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions. The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business.").

Because "a transferor's actual intent is rarely susceptible to direct proof," courts look "to the circumstances of the transfer to infer intent."  *Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655, 661 (5th Cir. 2017).  After fully considering the matter, the Court, pursuant to § 544, applying the Mississippi Fraudulent Transfer Act, finds that CHFS actually intended to hinder, delay, or defraud its creditors by making the Pre-Petition Transfers to insiders and/or affiliates of CHFS. While CHFS contended that the transfers were loans, the Court finds that they were fraudulent

---

[21] Presumably, the Warren Foundation was established by Dickson since his children, Colby Dickson and Cristen Dickson Nelson, were the primary beneficiaries.  (D. Ex. P-33 at 2). Dickson admitted he named the Warren Foundation.  (D. Adv. Dkt. 277-1 at 23).

transfers.  First, CHFS received little, if any, consideration for the Pre-Petition Transfers.  *See* MISS. CODE ANN. § 15-3-107(2)(h).  Second, the transferees were insiders and/or affiliates of CHFS.  *See* MISS. CODE ANN. § 15-3-107(2)(a).  Third, Dickson controlled the transferees, the Corporate Defendants, and, thus, effectively retained the possession, benefit, and use of the property transferred.  *See* MISS. CODE ANN. § 15-3-107(2)(b).  Fourth, the transfers were made in direct proximity of a legal dispute and litigation between CHFS and its most significant putative creditors in the Receivership Action, EFP and BHT, and Dr. Edwards.  *See* MISS. CODE ANN. § 15-3-107(2)(d).  Fifth, Dickson's post-petition criminal conduct provides a general chronology of events and transactions from which the Court may infer actual fraudulent intent.[22]  Indeed, Dickson's eventual use of the Warren Foundation to funnel money post-petition, *supra*, found its predicate in his establishment and use of that entity in connection with the Pre-Petition Transfers.  Accordingly, the Trustee is entitled to a judgment against Dickson, Double S, DMI, Dickson Enterprises, Crisco, Victory Consulting, and Warren Foundation for the avoidance of the Pre-Petition Transfers.[23]  Similarly, to the extent that the Loan Transfers, *supra*, were made pre-petition, the Trustee is entitled to avoid those transfers and to a judgment vesting title in the Estate of all loans ostensibly in the name of DMI or DHMI.

### 2.    Avoidance of Pre-Petition Transfers under § 548(a)(1)(A)

Section 548 provides:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

---

[22] *See supra* at 23-27.

[23] *See* MISS. CODE ANN. § 15-3-111(1)(a) ("In an action for relief against a transfer or obligation under this article, a creditor . . . may obtain . . . [a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.").

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . .

11 U.S.C. § 548(a)(1)(A).  After fully considering the matter, the Court finds, consistent with its findings above, that the Trustee is entitled avoid the Pre-Petition Transfers, which occurred less than 2 years before the commencement of the Bankruptcy Case.  Under § 550(d), the Trustee is entitled to only a single satisfaction under . . . this section."  11 U.S.C. § 550(d); *see Whitlock v. Lowe*, 569 B.R. 94, 101 (Bankr. W.D. Tex. 2017).  Accordingly, under §§ 548 and 550,[24] the Trustee is entitled to a judgment against Dickson, Double S, DMI, Dickson Enterprises, and Crisco as initial transferees and against Victory Consulting and Warren Foundation, jointly and severally, as mediate or immediate transferees in the amounts specified below, together with post-petition judgment interest at the legal rate until satisfied:

1.    Dickson:  $250,000 pursuant to Dickson Note;

2.    Double S:  $900,000 pursuant to Double S Notes 1 and 2;

3.    DMI:  $750,000 pursuant to DMI Note 1 and 2;

4.    Dickson Enterprises:  $350,000 pursuant to Dickson Enterprises Note;

5.    Crisco:  $950,000 pursuant to Crisco Notes 1 and 2; and

6.    Victory Consulting and Warren Foundation:  $3,700,000, jointly and severally.  *See*

11 U.S.C. § 550(d).  Further, to the extent the Loan Transfers, *supra*, occurred within two (2) years before the commencement of the Bankruptcy Case, the Trustee is entitled to avoid those transfers

---

[24] Section 550 provides that "to the extent that a transfer is avoided under section . . . 548 . . . the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from  . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made; or . . . any immediate or mediate transferee of such initial transferee."  11 U.S.C. § 550(a)(1)-(2).

and to a judgment vesting the title in the Estate of all loans ostensibly in the name of DMI or DHMI.

**D.    Count 9: Post-Petition Transfers**

Section 549 permits the trustee to avoid post-petition transfers of property made without authorization by the Court. *See* 11 U.S.C. § 549(a). The elements of a § 549 claim are as follows: "(1) a transfer of property occurred; (2) the property was property of the estate; (3) the transfer occurred after the commencement of the case; and (4) the transfer was not authorized by the Court or the Bankruptcy Code." *Litzler v. Am. Elk Conservatory, Inc. (In re Kelso)*, 196 B.R. 363, 368 (Bankr. N.D. Tex. 1996). Construed broadly, "[t]he term 'transfer' means . . . each mode, direct or indirect, absolute or unconditional, voluntary or involuntary, of disposing of or parting with . . . property or . . . an interest in property." 11 U.S.C. § 101(54)(D)(i)-(ii). Property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* § 541(a)(1).

As described in the Post-Petition, Pre-Trustee Events; Post-Petition, Post-Trustee Events; and the Combined Pre-Petition and Post-Petition Events, *supra*, Dickson and the Corporate Defendants transferred funds from DIP Accounts and diverted funds away from the Estate. The Court finds that funds, indeed, were transferred; the funds were property of the Estate; the transfers were made after CHFS filed its petition for bankruptcy relief; and the transfers were made without the Court's permission and contrary to the Cash Collateral Orders. Accordingly, after giving the same credits given in the Restitution Order, the Trustee is entitled to a judgment under §§ 549 and 550 against Dickson and the Corporate Defendants, jointly and severally, as mediate or immediate transferees in the amount of $5,442,004.58, together with post-judgment interest at the legal rate until satisfied. Similarly, to the extent transfers were made after the commencement of the

Bankruptcy Case, the Trustee is entitled to avoid the Loan Transfers and to a judgment vesting title in the Estate of all loans ostensibly in the name of DMI or DHMI.

## E.    Count 11: Turnover of Estate Property

Once a bankruptcy case begins, § 362 automatically imposes a statutory stay against "any act to . . . exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* § 541(a)(1). Construed broadly, "property of the estate includes the intangible and tangible property held by the [d]ebtor as of the [p]etition [d]ate." *West v. Hsu (In re Advanced Modular Power Sys., Inc.)*, 413 B.R. 643, 670 (Bankr. S.D. Tex. 2009). Accordingly, "an[y] entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease . . . shall deliver to the trustee, and account for, such property or the value of such property." 11 U.S.C. § 542(a).

At Trial, the Trustee testified that, following her appointment, she made demand on the Corporate Defendants, Dickson, and Rhodes for turnover of the Estate's property, including books and records. While Rhodes provided some documentation to the Trustee, neither Dickson nor the Corporate Defendants have complied fully with the demand. Specifically, the Trustee testified that Dickson refused to comply fully with the Court's Order Granting Edwards Family Partnership, LP and Beher Holdings Trust's Emergency Motion for Order Directing William D. Dickson to Show Cause and Directing Him to Return the Funds Transferred from the Bankruptcy Estate. (D. Ex. P-41). Additionally, the Trustee's efforts to administer the Estate were hindered by the absence of many operational documents and loan documents. Through John Allen, a former employee of CHFS, the Trustee gained remote access in April 2014 to two of CHFS's cloud-based servers, Mist and Koren, located in Panama. The two servers to which the Trustee gained access in April 2014

contained a significant amount of borrower documents and data.  The server access, however, temporarily was disrupted shortly afterward when Dickson, despite being incarcerated, instructed Rhodes to contact the cloud-host and terminate access.  Dickson, in late April 2014, executed consent to the cloud-host, and the Trustee's access to the servers was reestablished.  The Trustee obtained access to a third server, Bacco, in April of 2015 that purportedly contained loans owned by DMI and DHMI.  The Trustee, however, testified that those loans actually belonged to CHFS and were unlawfully assigned to the affiliates of DMI and DHMI.  As a result, the Trustee boarded the loans with Vantium Capital, Inc. (later known as ClearSpring), a professional servicing company, in April of 2015.  (Bankr. Dkt. 702).

Although the servers provided the Trustee with a significant amount of borrower data and documents, the Trustee testified that the servers were incomplete, containing little by way of operational documents and data.  Further, the Trustee learned that in many instances, to save recording fees, CHFS did not record mortgage assignments until a borrower paid off a loan.  As a result, the loans of public record were often in the name of an entity for which the Trustee has no authority to cancel the mortgage when the loan was paid off.  The Trustee was contacted by numerous borrowers who provided proof that their loans had been paid off, sometimes pre-petition, but that the mortgage had never been cancelled.  In many instances, the Trustee was unable to locate the original mortgage assignments to record them, and then release the mortgage.  The Trustee's counsel was able to prepare lost instrument affidavits or utilize powers of attorney in mortgage portfolio purchase agreements to effectuate, in many cases, the cancellation of mortgages, but this approach caused the Estate to incur additional administrative expenses.  Further, the Trustee learned that portions of the servers were password protected and, thus, could not be accessed.  Dickson initially pleaded the Fifth Amendment in response to the Trustee's Rule

2004 examination questions, but following his plea, Dickson testified that certain loan documents and codes to password-protected portions of CHFS's computer servicers are in a location in Panama that he has not disclosed.  (D. Adv. Dkt. 277-1 at 30, 46-47, 53, 57-58; D. Adv. Dkt. 277-2 at 10-11, 70-71).  The cyber-security division of the Trustee's forensic tracing expert, Horne LLP, confirmed the encryption and attempted without success to crack the password-protected portions of CHFS's servers.  (D. Ex. P-6).  As a result, the Trustee does not have all of CHFS books and records and cannot access the password protected portions of the servers.  Administration of the Estate, therefore, has been hampered, necessarily increasing servicing expenses and fees by ClearSpring and by the Trustee and her counsel.

Since the Trustee's testimony remains undisputed, the Court finds that Dickson and the Corporate Defendants are in possession, custody, or control of books, records, operational documents, and codes for the password protected portions of CHFS's computer servers that would be of use to the Trustee.  Accordingly, the Trustee is entitled to a judgment directing Dickson and the Corporate Defendants to turn over all relevant documents, records, passcodes, and computer servers to the Trustee.

## F.   Count 12: Violation of Automatic Stay

When a debtor files a petition for bankruptcy relief, § 362 automatically imposes a statutory stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case."  *Id.* § 541(a)(1).  As described in the Post-Petition, Pre-Trustee Events; the Post-Petition, Post-Trustee Events; and the Combined Pre-Petition and Post-Petition Events, *supra*, Dickson and his affiliated companies, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises,

Warren Foundation, Phalanx, and BBCC, exercised control over property of the Estate when they took and accepted money and documents from CHFS, despite knowing that CHFS had filed for bankruptcy relief.  Indeed, Dickson signed the petition for chapter 11 bankruptcy relief as CHFS's president.  (Bankr. Dkt. 1).  Pursuant to § 105(a) and § 362(k),[25] the Court finds that the Trustee is entitled to a judgment against Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, and BBCC for willful violation of the automatic stay.   As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339.  After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding additional Trustee's fees, ClearSpring's servicing fees, and additional Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of $13,485,492 as of the date of Trial.[26]  Accordingly, the Court finds that the Trustee is entitled to a judgment against Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, and BBCC, jointly and severally, in the amount of $13,485,492, together with post-judgment interest at the legal rate until satisfied.

---

[25] Section 362 provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).  Because the violation of the automatic stay is viewed as tantamount to the violation of a court order, a bankruptcy court may address a violation of the stay by exercising its civil contempt powers under § 105(a).  *See In re RX Pro of Miss., Inc.,* Adv. Proc. 16-00288-NPO (Bankr. S.D. Miss. Mar. 4, 2016), Dkt. 120 (granting corporate debtor relief under § 105 for violation of the automatic stay).

[26] *See supra* note 15.

G.    **Count 13: Conversion**

Under Mississippi law, "acts alleged to constitute a conversion must be positive and tortious." *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 773 (Miss. 2004). The tort of conversion requires "proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand." *Cmty. Bank, Ellisville, Miss.*, 884 So. 2d at 773-74 (quoting *McJunkin v. Hancock*, 176 P. 740, 742 (Okla. 1918)). In other words, conversion requires an "intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *First Inv'rs Corp. v. Rayner*, 738 So. 2d 228, 234 (Miss. 1999). While intent is essential, "the intent required is not the intent to be a wrongdoer." *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987). The Court assesses damages based upon "the value of the property at the time and place of the conversion." *Cmty. Bank, Ellisville, Miss.*, 884 So. 2d at 775. Lost profits are recoverable "where the loss is a proximate result of the defendant's act, and where the loss can be shown with reasonable certainty." *Cmty. Bank, Ellisville, Miss.*, 884 So. 2d at 775 (quoting *Pride Oil Co. v. Tommy Brooks Oil Co.*, 761 So. 2d 187, 192 (Miss. 2000)).

As described in the Post-Petition, Pre-Trustee Events; the Post-Petition, Post-Trustee Events; and the Combined Pre-Petition and Post-Petition Events, *supra*, the Court finds that Dickson and the Corporate Defendants converted property of the Estate for their own use, without receiving permission, by obtaining exclusive control over the funds in DIP Accounts and, in turn, diverting those funds from the Estate, and by repeatedly hindering, blocking, and denying the Trustee access to that property. Further, Dickson and the Corporate Defendants willfully interfered with the Trustee's duty to protect and acquire CHFS's property without lawful justification and

deprived the Estate of possession of the funds.  Additionally, as described in Turnover of Estate Property, *supra*, Dickson has refused to cooperate with the Trustee as required by § 521(a)(3)-(4).

As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339.  After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding additional Trustee's fees, ClearSpring's servicing fees, and additional Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of $13,485,492 as of the date of Trial.[27]  Accordingly, the Trustee is entitled to a judgment against Dickson and the Corporate Defendants, jointly and severally, in the amount of $13,485,492, together with post-judgment interest at the legal rate until satisfied.

## H.    Count 15: Equitable Subordination of Claims

Section 510 provides that the Court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  11 U.S.C. § 510(c)(1).  In other words, "a proof of claim can be subordinated to a single claim, or all or a class of claims. The former remedy is a personal remedy based on personal injuries while the latter is a general remedy based on general injuries shared by all or a class of creditors."  *Cadleway Props., Inc. v. Andrews (In re Andrews)*, No. 02-0001, 2009 WL 1076831, at *4 (Bankr. S.D. Tex. Apr. 2, 2009).  In *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977), the Fifth Circuit analyzed equitable subordination under the premise that bankruptcy courts are courts of equity.  *Id.* at 698-99.  Indeed, bankruptcy courts have exercised their equitable powers "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done."

---

[27] *See supra* note 15.

*Pepper v. Litton*, 308 U.S. 295, 304-05 (1939). With this premise in mind, the Fifth Circuit found that three conditions must be satisfied before a bankruptcy court exercises its power of equitable subordination: (1) "[t]he claimant must have engaged in some type of inequitable conduct," (2) "[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant," and (3) "[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *In re Mobile Steel Co*., 563 F.2d at 699-700.

In the Bankruptcy Case, Dickson filed Proof of Claim 10-1 (Bankr. Cl. 10-1) on September 20, 2012, for an unknown amount. As described in the Post-Petition, Pre-Trustee Events; the Post-Petition, Post-Trustee Events; and the Combined Pre-Petition and Post-Petition Events, *supra*, the Court finds that Dickson's removal of funds in the DIP Accounts and Dickson's efforts to cause CHFS and the Corporate Defendants to divert money away from the Estate was fraudulent, illegal, and a breach of his fiduciary duty as an officer of CHFS. As a result, the Court further finds that Dickson used CHFS to engage in inequitable conduct that injured the Estate. Accordingly, pursuant to § 510, Dickson's Proof of Claim is equitably subordinated to all other creditors and claims.[28]

## I.    Count 16: Civil Conspiracy

Under Mississippi law, civil conspiracy consists of the following elements: "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result." *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004). The Trustee bases her civil conspiracy claim on conversion and tortious interference with a contract.

---

[28] The Trustee has not objected to Proof of Claim 10-1.

After fully reviewing the matter, the Court finds that the Trustee's claim fails to satisfy the first element of a civil conspiracy claim, known as the plurality requirement. In Mississippi, "[a] conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). Under the intra-corporate conspiracy doctrine, "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of agents are the acts of the corporation." *Frye v. Am. Gen. Fin. Inc.*, 307 F. Supp. 2d 836, 843-44 (S.D. Miss. 2004); *see Cooper v. Drexel Chem. Co.*, 949 F. Supp. 1275, 1285 (N.D. Miss. 1996) (holding that individual defendants are incapable of conspiring with their corporate employer unless they acted outside their employment capacities).

The facts here implicate the intra-corporate conspiracy doctrine but raise a slightly different issue. May two entities conspire through a single agent?[29] In the Amended Complaint, the Trustee named as defendants CHFS, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Dickson, Warren Foundation, Phalanx, BBCC, Colby Dickson, Cristen Dickson Nelson, Beau Nelson, Runnels, Rhodes, Clark, and Head. Dickson, Colby Dickson, Cristen Dickson Nelson, Beau Nelson, Runnels, and Rhodes are the natural persons named as defendants in the Amended Complaint. With the exception of Dickson and Rhodes, however, the remaining natural persons named as defendants were either dismissed from the Dickson Adversary Proceeding or the claims against them were resolved. (D. Adv. Dkt. 177, 213 & 280).

The evidence at Trial did not show that any partner or agent of the Corporate Defendants, other than Dickson, was involved in the alleged conspiracy. Indeed, after Rhodes testified at Trial, counsel for the Trustee conceded that Rhodes, perhaps, "was caught between a rock and a hard

---

[29] *See* Global Op. at 199-202.

place" with respect to her employment under Dickson.  (D. Adv. Dkt. 296 at 131).  In effect, the Trustee's civil conspiracy claim rests sole on the conduct of Dickson, a single agent purportedly acting on behalf of the Corporate Defendants.  No reported Mississippi case has discussed or applied the intra-corporate conspiracy doctrine under these facts.  Courts in other jurisdictions have concluded that the tort of conspiracy does not exist apart from the underlying wrongful act on which the conspiracy is based in the absence of two human conspirators.  *United States v. Panhandle Trading, Inc.*, No. 05:05-cr-00044-RS-ALL, 2006 WL 1883436, at *3-4 (N.D. Fla. 2006).

In a factually analogous case widely cited for its treatment of the "single agent problem," *Lockwood Grader Corp. v. Bockhaus*, 270 P.2d 193 (Colo. 1954), the Supreme Court of Colorado ruled that a "conspiracy cannot be shown by acts of one person, no matter how many corporations he represents."  *Id.* at 196; *see, e.g.*, *Panhandle Trading, Inc.*, 2006 WL 1883436, at *1-2; *Conspiracy, Group Danger and the Corporate Defendant*, 52 U. Cin. L. Rev. 431, 434-35 (1983).  In *Lockwood Grader Corp.*, Ralph L. Bockhaus ("Bockhaus") alleged that Lockwood Grader Corporation, Lockwood Graders of Colorado, and T.J. Lockwood ("Lockwood") unlawfully conspired to force him out of business.  Lockwood was the majority stockholder, director, and president of both Lockwood Grader Corporation and Lockwood Graders of Colorado.  The jury returned a verdict in favor of Bockhaus.  On appeal, the state court reversed, holding that Bockhaus failed to prove the existence of a conspiracy because the evidence at trial showed that Lockwood was the only person who could possibly have acted for either of the corporations.  *Lockwood Grader Corp.*, 270 P.2d at 196-97.

The Court finds that Dickson, acting alone, lacked the ability to form a conspiracy with himself.  The policy underlying a conspiracy claim—holding combinations of individuals

responsible—does not apply when one person uses several entities to carry out his tortious conduct. Although a conspiracy might be formed by several entities acting through several agents, more than one person must be involved in the conspiracy. Thus, if some partner or agent of the Corporate Defendants, other than Dickson, had participated in the alleged conspiracy, then the Trustee would have satisfied the plurality requirement for a civil conspiracy. Because the evidence did not show that anyone other than Dickson was involved in the alleged conspiracy, however, the Court finds that the Trustee has failed to meet her burden of proof.

## Conclusion

For the above and foregoing reasons, the Court declares and/or finds as follows:

1.      Count 1 (Federal RICO): Dickson, but not Rhodes, violated the Federal RICO Act. The Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339. After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding Trustee's fees, ClearSpring's servicing fees, and other Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of $13,485,492 as of the date of Trial. Accordingly, the Trustee is entitled to a judgment against Dickson for the amount of $13,485,492, trebled, together with post-judgment interest at the legal rate until satisfied.

2.      Count 2 (Mississippi Racketeering Act): Dickson, but not Rhodes, violated the Mississippi Racketeering Act. As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339. After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding Trustee's fees,

ClearSpring's servicing fees, and other Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of $13,485,492 as of the date of the Trial. Accordingly, the Trustee is entitled to a judgment against Dickson for the amount of $13,485,492, trebled, together with post-judgment interest at the legal rate until satisfied.

3.      Count 3 (Tortious Interference with Contract): Dickson and the Corporate Defendants tortiously interfered with CHFS's contracts with its borrowers. As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339. After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding additional Trustee's fees, ClearSpring's servicing fees, and additional Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of $13,485,492 as of the date of the Trial. Accordingly, the Trustee is entitled to a judgment against Dickson and the Corporate Defendants, jointly and severally, in the amount of $13,485,492, together with post-judgment interest at the legal rate until satisfied.

4.      Count 4 (Mississippi Fraudulent Transfer Act): Dickson and the Corporate Defendants fraudulently transferred CHFS's assets. Accordingly, the Trustee is entitled to a judgment against Dickson and the Corporate Defendants for the avoidance of the Pre-Petition Transfers. Similarly, to the extent that the Loan Transfers were made pre-petition, the Trustee is entitled to avoid those transfers and to a judgment vesting title in the Estate of all loans ostensibly in the name of DMI or DHMI.

5.      Count 5 (Avoidance of Transfers by Dickson Enterprises): The Trustee has abandoned Count 5, and, therefore, Count 5 is dismissed with prejudice.

6.      Count 6 (Avoidance of Preferential Transfers):  The Trustee has abandoned Count 6, and, therefore, Count 6 is dismissed with prejudice.

7.      Count 7 (Avoidance of Pre-Petition Transfers under § 548(a)(1)(A)): Dickson and the Corporate Defendants fraudulently transferred CHFS's assets. Accordingly, under §§ 548 and 550, the Trustee is entitled to a judgment against Dickson, Double S, DMI, Dickson Enterprises, and Crisco as initial transferees and against Victory Consulting and Warren Foundation, jointly and severally, as mediate or immediate transferees, in the amounts specified below, together with post-petition judgment interest at the legal rate until satisfied:

a.      Dickson:  $250,000 pursuant to Dickson Note;

b.      Double S:  $900,000 pursuant to Double S Notes 1 and 2;

c.      DMI:  $750,000 pursuant to DMI Note 1 and 2;

d.      Dickson Enterprises:  $350,000 pursuant to Dickson Enterprises Note;

e.      Crisco:  $950,000 pursuant to Crisco Notes 1 and 2; and

f.      Victory Consulting and Warren Foundation:  $3,700,000, jointly and severally.  *See* 11 U.S.C. § 550(d).  Further, to the extent the Loan Transfers, *supra*, occurred within two (2) years before the commencement of the Bankruptcy Case, the Trustee is entitled to avoid those transfers and to a judgment vesting the title in the Estate of all loans ostensibly in the name of DMI or DHMI.

8.      Count 8 (Avoidance of Pre-Petition Transfers under § 548(a)(1)(B)):  The Trustee has abandoned Count 8, and, therefore, Count 8 is dismissed with prejudice.

9.      Count 9 (Post-Petition Transfers): Dickson and the Corporate Defendants transferred CHFS's assets post-petition.  Accordingly, after giving the same credits given in the Restitution Order, the Trustee is entitled to a judgment under §§ 549 and 550 against Dickson and

the Corporate Defendants, jointly and severally, as mediate or immediate transferees in the amount of $5,442,004.58, together with post-judgment interest at the legal rate until satisfied. Similarly, to the extent transfers were made after the commencement of the Bankruptcy Case, the Trustee is entitled to avoid the Loan Transfers and to a judgment vesting the title in the Estate of all loans ostensibly in the name of DMI or DHMI.

10.    Count 10 (Temporary Restraining Order & Prohibitory Injunctions): The Trustee has abandoned Count 10, and, therefore, Count 10 is dismissed with prejudice.

11.    Count 11 (Turnover of Estate Property): Dickson and the Corporate Defendants are in possession, custody, or control of books, records, operational documents, and codes for the password protected portions of CHFS's computer servers that would be of use to the Trustee. Accordingly, the Trustee is entitled to a judgment directing Dickson and the Corporate Defendants to turn over all relevant documents, records, passcodes, and computer servers to the Trustee.

12.    Count 12 (Violation of the Automatic Stay): Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, and BBCC violated the automatic stay. As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339. After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding Trustee's fees, ClearSpring's servicing fees, and other Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of $13,485,492 as of the date of the Trial. Accordingly, the Court finds that the Trustee is entitled to a judgment against Dickson, DMI, DHMI, Double S, Crisco, Victory Consulting, Dickson Enterprises, Warren Foundation, Phalanx, and BBCC, jointly

and severally, in the amount of $13,485,492, together with post-judgment interest at the legal rate until satisfied.

13.     Count 13 (Conversion): Dickson and the Corporate Defendants converted property of the Estate.  As previously stated, the Trustee's Victim Impact Statement (D. Ex. P-4) submitted in the Criminal Proceeding on December 8, 2015, reflected approximate damages to the Estate as of that date in the amount of $16,454,339.  After subtracting credits to Dickson per the Restitution Order in the amount of $6,703,837.78 and after adding additional Trustee's fees, ClearSpring's servicing fees, and additional Estate professional fees and expenses (D. Ex. P-45), the Estate has been damaged in the amount of $13,485,492 as of the date of Trial.  Accordingly, the Trustee is entitled to a judgment against Dickson and the Corporate Defendants, jointly and severally, in the amount of $13,485,492, together with post-judgment interest at the legal rate until satisfied.

14.     Count 14 (Usurpation of Corporate Opportunity): The Trustee has abandoned Count 14, and, therefore, Count 14 is dismissed with prejudice.

15.     Count 15 (Equitable Subordination of Claims): Pursuant to § 510, Dickson's Proof of Claim is equitably subordinated to all other creditors and claims.

16.     Count 16 (Civil Conspiracy): The Trustee failed to meet her burden of proof with respect to her civil conspiracy claim, and, therefore, Count 16 is dismissed with prejudice.

17.     Count 17 (Veil Piercing/Alter Ego):  The Trustee has abandoned Count 17, and, therefore, Count 17 is dismissed with prejudice.

18.     The Trustee's claims against Rhodes are dismissed with prejudice.

19.     The Trustee is entitled only to a single recovery where the same damages are granted under different legal theories.

20.     The costs of the Dickson Adversary Proceeding are taxed against Dickson and the Corporate Defendants under 28 U.S.C. § 1920.

To the extent the Court has not addressed any of the parties' other arguments or positions, it has considered them and determined they would not alter the result.  A separate final judgment consistent with this Opinion will be entered in accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

##END OF OPINION##